```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
                     EASTERN DIVISION

JOHNNY WILLIAMS,                      )
                                      )
          Plaintiff,                  )
                                      )
    v.                                )   No. 4:09 CV 1470 DJS / DDN
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )
```

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Johnny Williams for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401-34 and 1381-1383f. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

### I. BACKGROUND

Plaintiff, who was born in 1964, filed his applications on August 16, 2007, alleging a February 15, 2002 onset date of disability. (Tr. 116, 124.) He claimed disability due to stomach tumors, stress, back pain, burning scalp, hair loss, headaches, stomach staples from a surgery, and shoulder pain. (Tr. 175.) His claim was denied initially. (Tr. 73.)

On February 3, 2009, following a hearing, an Administrative Law Judge (ALJ) found that plaintiff was not disabled under the Act. (Tr. 55-67.) On July 17, 2009, the Appeals Council denied his request for review and the decision of the ALJ thus became the final decision of the Commissioner.

### II. MEDICAL AND OTHER HISTORY

From January 8-10, 2002, plaintiff was treated at Barnes Jewish Hospital (Barnes) for right lower lobe pneumonia, nonspecific abdominal pain, and left testicular pain, with a history of testicular cancer and possible proteinuria[1] also noted. (Tr. 286-88, 290-91.) An abdominal CT scan also showed diverticulosis[2] without diverticulitis.[3] (Tr. 288.)

On June 7, 2005, plaintiff was treated in the emergency room at Barnes after an exercise machine fell on his legs. (Tr. 231-46.) Diagnoses included contusions of the right lower leg, left lower leg, and right foot. (Tr. 239.)

On September 12, 2007, plaintiff was seen for a consultative examination by Fedwa Khalifa, M.D. (Tr. 247-54.) Plaintiff complained of a stomach tumor, back pain, foot and shoulder pain, burning scalp and hair loss, stress, and headaches. (Tr. 247.) Dr. Khalifa described his appearance as disheveled. (Tr. 253.) Plaintiff described his history of testicular and stomach cancer. (Id.) He complained of pain in his stomach with frequent nausea and vomiting every other day; diarrhea and a ten pound weight loss over the previous six months; and low back pain that began a few years earlier. (Id.)

Plaintiff could walk two to three blocks, stand ten to fifteen minutes, sit fifteen to twenty minutes, and lift twenty pounds. (Tr. 247-48.) He had difficulty sleeping at night due to back pain. (Tr. 248.) He started having foot pain secondary to multiple calluses in both feet three years previously, and shoulder pain one and one half years earlier. The pain was constant and associated with stiffness. (Id.) The burning sensation on his scalp with patchy hair loss had

---

[1]The presence of urinary protein in amounts exceeding 0.3 grams in a 24-hour urine collection or in concentrations more than 1 gram per liter in a random urine collection on two or more occasions at least 6 hours apart. Stedman's Medical Dictionary 1583 (28th ed. 2006).

[2]Diverticulitis is the presence of a number of diverticula of the intestine, common in middle age. Stedman's at 575. Diverticula are pouch or sac openings from a tubular or saccular organ, such as the gut or bladder. Id.

[3]Inflammation of the of the small pockets in the wall of the colon. Stedman's at 575.

-2-

started five years earlier. He had been diagnosed with lupus and administered injections which did not stop the hair loss. (Id.)

Plaintiff also complained of daily throbbing headaches which had started a year and a half earlier and for which he took Tylenol. (Id.) The headaches were associated with nausea, occasional vomiting, scalp tenderness, and dizziness. (Id.) He also reported a lot of stress in his life. (Id.)

Dr. Khalifa noted that plaintiff had not seen a medical doctor for several years, and was not taking any medications. (Tr. 249.) Plaintiff demonstrated normal strength, normal sensation, normal fine and gross motor movements, and normal range of motion of all extremities. (Tr. 249, 251-52.) Plaintiff took no medication for his back pain, and there was no tenderness or limitation of range of motion of the back. (Tr. 249.) Dr. Khalifa found no limitations of back movement or tenderness. She noted that although plaintiff complained of nausea and vomiting, he had not been evaluated for possible cancer relapse. She noted that multiple calluses on both feet were causing pain. (Tr. 249-50.)

On September 27, 2007, Judith McGee, Ph.D., a nontreating physician, completed a Psychiatric Review Technique form, concluding that plaintiff had no mental medically determinable impairment. (Tr. 255, 265.)

From April 10, 2007 through May 9, 2008, plaintiff was treated at the St. Louis County Department of Health John C. Murphy Health Center. (Tr. 266-73, 292-93, 297-309, 315-22.) In November 2007, plaintiff complained of a headache, but his examination was essentially normal. (Tr. 338, 340.) Plaintiff had regular check-ups at the Murphy Health Center through December 2007. (Tr. 309-13.)

At a physical examination on December 6, 2007, plaintiff had calluses on his foot, but had a normal posture and normal gait. (Tr. 307-08.) X-rays showed minimal scoliosis and early minimal changes of degenerative disc disease. (Tr. 345.) A review of systems showed a rash on his face that had been present for the last few months; daily headaches; daily chest pain for the past few months, with sweating and shortness of breath at times; abdominal pain, bloody stool (last episode

one week earlier), gas, nausea, and vomiting; back, joint, and muscle pain; depression and mood changes; cold and heat intolerance, excessive thirst, and excessive urination; and pain of the stomach, head, abdomen, back, and ankles. (Tr. 306-07.) He was referred to St. Louis Connect Care Rheumatology, Cardiology, Gastroenterology, Oncology, and Podiatry departments. (Id.)

On February 12, 2008, plaintiff was seen by Robert Baird, M.D., for a follow-up visit. (Tr. 301-03.) Dr. Baird noted that plaintiff had not filled his prescriptions, obtained the lab tests he ordered, or been seen in the Rheumatology Department, and that he had had great difficulty navigating the Connect Care system in general. (Tr. 301.) Dr. Baird's assessment was backache, unspecified, and question of systemic lupus erythematosus.[4] (Tr. 302.)

On April 2, 2008, plaintiff was seen at Connect Care Cardiology for chest pain and shortness of breath. He was observed to have persistent sinus tachycardia or rapid heart beat, and a firm thyroid, but was felt to have no cardiac disease. Notes indicate he was a pack-and-a-half day smoker for the past twenty years. (Tr. 274, 378.)

From November 30, 2007 to September 15, 2008, plaintiff was treated at Myrtle Hilliard Davis Comprehensive Health Center. (Tr. 323-56.) On several occasions during this period, specifically, January 4, January 23, April 7, August 1, August 22, and September 15, 2008, plaintiff was seen by podiatrist Dr. Henry Bradford for palliative care.[5] (Tr. 324- 27, 330-33, 336-37, 343.) Dr. Bradford diagnosed pes planovalgus,[6] hallux

---

[4]Lupus erythematosus is a chronic auto-immune disease which occurs in different forms. Systemic lupus erythematosus is an inflammatory connective tissue disease with variable features frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions on the face, neck or upper extremities, with liquefaction and degeneration of the basal layer and epidermal atrophy. Stedman's at 1124.

[5]Palliative care endeavors to reduce the severity of symptoms without curing the underlying cause. Stedman's at 1407.

[6]A condition in which the longitudinal arch is broken down, the entire sole touching the ground. Stedman's at 1468.

abductovalgus (HAV)[7] with bunion, plantar keratoses or thickening of the skin, heloma durum or hard corns, and hammertoe syndrome.[8] (Tr. 343.) On January 23, 2008, Dr. Bradford noted the following with respect to the condition of plaintiff's feet: **"REVIEW OF SYSTEMS: Musculoskeletal symptoms:** The arch of the foot is lost, a change in the arches of both feet, joint pain in the great toe of both feet, and toe deformity which is progressively worsening." (Tr. 336.) During that visit, Dr. Bradford discussed plaintiff obtaining foot orthotics. (<u>Id.</u>)

From December 4, 2007 through September 18, 2008, plaintiff was treated at St. Louis Connect Care. (Tr. 360-428.) On January 16, 2008, he was seen for blood in his stool, and was told that approval for a colonoscopy would be sought. (Tr. 282-83, 384-85.) He was also seen in the Orthopedic Clinic that day for back pain for the past year and a half. (Tr. 386, 388.)

On February 13, 2008, plaintiff was seen for chest pain and shortness of breath. (Tr. 276-80, 381.) The chest pain was described as atypical, constant, and either musculoskeletal or due to a pulmonary problem. (Tr. 276, 381.) An ECG showed possible left atrial enlargement and a septal infarct or tissue necrosis of undetermined age. (Tr. 277.)

In February 2008, plaintiff sought treatment for back pain. (Tr. 301.) On physical examination, he had a normal posture and gait, and was diagnosed with a backache. (Tr. 301-02.) He missed six appointments in February and March 2008. (Tr. 298, 399, 410, 421, 422, 428.)

On April 2, 2008, plaintiff was seen again for shortness of breath and chest pain. (Tr. 274, 378.) On April 3, 2008, he was seen for overall joint pain. (Tr. 373-77.) Dr. Zarmeena Ali observed abnormal

---

[7]Hallux vulgas is a deviation of the distal portion of the great toe at the metatarsophalangeal joint, toward the outer or lateral side of the foot. <u>Id.</u> at 848.

[8]Hammertoe is a permanent flexion deformity of a toe at an interphalangeal joint. <u>Id.</u> at 1995.

scarring alopecia (hair loss) of the scalp with vitilligo,[9] muscle spasms in multiple locations along and near the lumbar spine, anxious mood, and absent or diminished deep tendon reflexes in both legs. (Tr. 375-76.) Dr. Ali diagnosed lupus erythematosus and ordered a spinal MRI. (Tr. 376.) On July 8, 2008, he was seen for rectal bleeding due to hemorrhoids, and a colonoscopy was ordered. (Tr. 371.)

On September 17, 2008, plaintiff's treating podiatrist, Dr. Bradford, D.P.M., completed a Medical Questionnaire Foot Problems Statement. (Tr. 358-59.) He described plaintiff's history of foot problems as "painful feet related to corns and calluses in multiple locations on both feet. Also, hammertoe deformities and bunions on both feet. A flatfoot condition was also observed on both feet." (Tr. 358.) He diagnosed HAV with bunion deformity, hammertoe deformity, heloma durum or hard corns, plantar or sole keratoses,[10] and pes (foot) planovalgus.[11] (Id.)

Dr. Bradford opined that plaintiff's ability to stand would vary from fifteen minutes to four hours; that his ability to walk a block on rough or uneven surfaces, walk enough to shop or bank, and climb steps ranged from "yes" to "no"; and that his pain ranged from mild to severe. (Tr. 358-59.) He further stated:

> Pain from corns and calluses can be temporarily alleviated by debridement of these lesions; however, they will return shortly currently, every 3 weeks. The flatfoot deformity can usually be improved with foot orthotics, and these have been recommended to the patient cost = $15.00. Finally, to correct the hammertoe and bunion deformities, surgery would be needed presently the patient is not amenable to this option. The questions above concerning the standing, walking, climbing stairs, and pain level are answered assuming that the patient has had a recent (1 day) debridement of corns and calluses, and his abilities thereafter will diminish.

---

[9]The appearance of otherwise normal skin of nonpigmented white patches of varies sizes, often symmetrically distributed and usually bordered by hyperpigmented areas. Id. at 2139.

[10]Keratosis is any lesion on the epidermis marked by the presence of circumscribed overgrowths of the horny layer. Id. at 1026.

[11]A condition in which the longitudinal arch of the foot is flattened and the hind foot is everted. Id. at 1505.

(Tr. 359.)(emphasis added).

On October 30, 2008, plaintiff saw Alan Morris, M.D., for an orthopedic consultative examination. (Tr. 433-44.) Plaintiff was able to walk independently for 50 feet without any exertional support and could stand on his heels and toes. (Tr. 435.) He could squat to an 80 degree flexion of both knees and rise without obvious pain, get in and out of a chair, and climb on and off the examination table without difficulty. (Tr. 435.) There was no evidence of scoliosis, loss of lumbar lordosis, lumbar muscle spasm, and no tenderness to palpation. (Tr. 435.) Dr. Morris noted significantly diminished deep tendon reflexes in plaintiff's knees and ankles, and diminished range of motion in his shoulders, hips, ankles, cervical spine, and lumbar spine. (Tr. 435, 443-44.) He had normal strength and sitting posture. (Tr. 435-36.) Plaintiff had a flatfoot deformity and calluses bilaterally. (Tr. 436.) Dr. Morris diagnosed chronic lumbar strain and bilateral trapezius muscle pain. (Tr. 436.) He observed mild bilateral pes planus, visible HAV of the left great toe, bunions, non correctable hammertoes on the left foot, and callosities or calluses on both feet. (Tr. 436.)

In a Medical Source Statement dated the same day, Dr. Morris opined that plaintiff could lift and carry up to 10 pounds continuously; up to 50 pounds occasionally; and up to 20 pounds frequently; sit for one hour at a time and stand or walk for 30 minutes at a time; sit for five hours, stand for two hours, and walk for one hour in an eight hour workday; reach only frequently with either hand; never crouch or crawl, occasionally stoop, kneel, or climb ladders or scaffolds, and frequently balance and climb stairs or ramps; and tolerate occasional exposure to unprotected heights. (Tr. 437-41.)

**Forms Completed by Plaintiff and Third Parties**

On August 16, 2007, plaintiff completed a Disability Report Adult form, listing the conditions limiting his ability to work as stomach tumors, stress, back pain, burning scalp, hair loss, headaches, stomach staples from prior surgery, and shoulder pain. (Tr. 174, 180.) He stated that he could not stand on ladders to paint. (Id.) He listed

-7-

past work from 1986 as a dishwasher, janitor, laborer, painter, salesperson, and security guard. (Tr. 176.)

On September 3, 2007, plaintiff completed a Function Report Adult form. (Tr. 181-88.) He described his daily activities as eating and attempting to work. (Tr. 181.) He stated he could no longer paint or do janitorial work, and that his sleep was affected by headaches and pain in his back, stomach, and feet. (Tr. 182.) He stated that he was able to cook and clean, except that he needed help with cleaning that required bending. (Tr. 183.) He stated that he shopped for groceries once a week, and that his hobbies and interests included painting and baseball, although he could no longer do either of those. (Tr. 185.) He could sit and watch TV, go to his sister's home, and seek work when able. (Id.) His abilities affected by his condition included lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating, and using his hands. (Tr. 186.) He stated that he could walk a block, then would need to rest five to ten minutes. (Id.) He stated that he did not handle stress or changes in routine well; that he did not follow written instructions well; and that he was "stressed out." (Tr. 186-87.)

That same day plaintiff also completed a Work History Report form. (Tr. 189-196.) He also completed an undated Disability Report Appeal form stating that his foot pain worsened in approximately August 2007, but that he was able to care for his personal needs. (Tr. 211-216.)

On September 4, 2007, plaintiff's sister, Delores Oden, completed a Function Report Adult Third Party form describing her observation of plaintiff's daily functioning and limitations. (Tr. 197-205.)

**Testimony at the Hearing**

On October 2, 2008, plaintiff testified at a hearing before an ALJ. (Tr. 11-51.) He was 44 years old and had a tenth grade education. (Tr. 19.) He testified that he could cook, wash his clothes, wash dishes, make his bed, and vacuum, mop, and sweep a small room. (Tr. 26.) He shopped for groceries, could lift a gallon of milk, sometimes attended church on Sundays, visited his relatives, or watched movies. (Tr. 28-

29.)  He took medication for pain in his back, feet, and shoulder without side effects.  (Tr. 32-36.)

Plaintiff testified that his overall condition began to worsen in February 2002.  He testified that he had applied for painting and carpentry work since that time, and that he had occasionally landed odd jobs, although not in the past five or six years.  (Tr. 20-21.)  He testified that he did not feel that he could paint or do carpentry any longer due to his feet and back.  (Tr. 21.)  He testified about his past work as a janitor, dishwasher, maintenance man, laborer, painter, seller of souvenirs at Busch Stadium, and security guard.  (Tr. 21-25.)  He described his back pain, foot problems, shoulder pain, prior treatment for testicular cancer, the surgical wires that remain in his stomach, his stomach tumors, and a hole, presumably on his scalp, that was growing.  (Tr. 32-38.)

Plaintiff testified that he experienced a lot of stress, but was not under mental health care.  (Tr. 38.)  He testified that his back pain required him to twist and move while sitting.  (Tr. 38-39.)  He testified he could stand for fifteen to twenty minutes, walk about a block, and lift five to ten pounds or two shopping bags.  (Tr. 39.)  He testified that he had difficulty bending and squatting.

Plaintiff further testified that he had daily headaches that lasted 10 minutes to three to four hours, and that the pain medicine he took sometimes helped.  (Tr. 40.)  He testified that he napped for fifteen to thirty minutes about three or four times a day and that his back pain prevented him from sleeping well at night.  (Tr. 40-41.)

Vocational Expert (VE) Jeffrey F. Magrowski,[12] Ph.D., testified at the hearing.  (Tr. 41-49.)  The ALJ asked the VE to assume a hypothetical person with plaintiff's age, education and work experience, who was limited to light work with several additional postural limitations.  The VE testified that there would be no transferable skills, but that such a claimant could do plaintiff's past work as a security guard, along with other jobs.  (Tr. 43-45.)

---

[12]Misspelled "McGrowski" in the transcript.

In a second hypothetical question, the ALJ gave a limitation to sedentary work, but with the ability to sit, stand, or walk for six hours in an eight hour day, and with additional postural limitations similar to those in the first hypothetical. (Tr. 46-47.) The VE testified that past work would be eliminated, but that there would be other jobs that such a claimant could perform. (Tr. 47.)

In a third hypothetical, the ALJ gave the same limitations as in the second, except that the claimant would be limited to sitting six hours and standing or walking for two hours in an eight hour day. (Tr. 47-48.) Dr. Magrowski said that the same jobs he had given in response to the second hypothetical could be done under these limitations. (Tr. 48.)

A fourth hypothetical asked the VE to assume an ability to do light work, but with the foot related limitations described by Dr. Bradford. (Tr. 49, 358-59.) The VE testified that such a claimant would not be able to perform past work or maintain sustained employment and would probably be terminated. (Tr. 49-50.)

In response to a fifth hypothetical based on the need to take naps as described by plaintiff's testimony, the VE testified that such a limitation would not be compatible with sustained employment. (Tr. 50.)

At the end of the hearing, the ALJ ordered an orthopedic consultative examination, but denied counsel's request for a mental consultative examination. (Tr. 50-51.)

### III. DECISION OF THE ALJ

On February 3, 2009, the ALJ entered an unfavorable decision. (Tr. 55-67.) At Step One, the ALJ determined that plaintiff had not engaged in substantial gainful activity since February 15, 2002, his alleged onset date. (Tr. 65.) At Step Two, the ALJ found that plaintiff had recurrent corns and calluses and various permanent bunions and hammertoes on both feet, mild early degenerative disc disease of the lumbosacral spine, occasional headaches, and a history of right testicular cancer. (Id.) The ALJ did not specifically characterize the severity of these impairments, except to say that plaintiff had no severe impairments that were unrelated to his feet. (Tr. 64.)

At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing. (Tr. 65.) The ALJ determined that plaintiff could perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking; lifting or carrying objects weighing more than 10 pounds; or doing more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 66.) The ALJ found no credible, medically established mental or other nonexertional limitations. (Id.)

At Step Four, the ALJ found that plaintiff could not perform his past relevant work (PRW). (Id.) At Step Five, the ALJ found that while plaintiff was unable to perform the full range of sedentary work, he could perform jobs that existed in significant numbers in the local and national economies, thereby concluding that plaintiff was not disabled. (Id.) These jobs are food and beverage order clerk, medical supplies packager, and weight tester. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in

death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140 42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his PRW. Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues that the ALJ erred in (1) interpreting Dr. Bradford's September 17, 2008 statement; (2) failing to send plaintiff to a psychological consultative exam; and (3) assessing his RFC.

### 1. Treating Podiatrist Dr. Bradford's Opinion

Plaintiff argues that the ALJ erred in interpreting treating podiatrist Dr. Bradford's September 17, 2008 statement. The undersigned disagrees.

On September 17, 2008, Dr. Bradford opined that plaintiff's ability to stand would vary from fifteen minutes to four hours; that his ability to walk a block on rough or uneven surfaces, walk enough to shop or bank, and climb steps ranged from "yes" to "no"; and that his pain ranged from mild to severe. (Tr. 358-59.) He further stated:

-12-

> Pain from corns and calluses can be temporarily alleviated by debridement of these lesions; however, they will return shortly -- currently, every 3 weeks. The flatfoot deformity can usually be improved with foot orthotics, and these have been recommended to the patient -- cost = $15.00. Finally, to correct the hammertoe and bunion deformities, surgery would be needed -- presently the patient is not amenable to this option. The questions above concerning the standing, walking, climbing stairs, and pain level are answered assuming that the patient has had a recent (1 day) debridement of corns and calluses, and his abilities thereafter will diminish.

(Tr. 359.)(emphasis added).

The ALJ stated in his opinion:

> The problem with Dr. Bradford's assessment ... is that it is worded somewhat ambiguously. The undersigned does not interpret it as meaning that the claimant nearly always is prevented from standing more than 15 minutes at a time or more than 4 hours out of an 8-hour day, but rather that these are temporary limitations that occur each time the claimant has recurrence of corns or calluses, and debridement is necessary to remove them, followed by a normal surgical recovery period. Dr. Bradford pointed out that the *pain* can be managed well with an inexpensive orthotic device, which the claimant was reluctant to obtain. His actual clinic notes ... from about January to September 2008, do not indicate that these kinds of limitations are chronic and largely continuous ones. Most of the time he saw the claimant for routine "palliative" foot care. The undersigned interprets Dr. Bradford's report as meaning that the claimant can do at least sedentary work most of the time, and that any lesser capacity occurs infrequently, not often enough to prevent the claimant from maintaining a normal work schedule.

(Tr. 63.)(emphasis added).

The Commissioner argues the ALJ properly analyzed Dr. Bradford's opinion, noting that Dr. Bradford indicated extreme limitations in walking and standing due to the development of corns and calluses once every three weeks, immediately prior to debridement. (Tr. 63, 358-59.) The Commissioner further argues the ALJ appears to have given some weight to Dr. Bradford's opinion, noting that the ALJ limited plaintiff to sedentary work, but that he ultimately did not give the opinion substantial or controlling weight, as reflected in plaintiff's RFC. (Tr. 62-63.)

-13-

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). See 20 C.F.R. § 404.1527(d)(2). An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Id.; see also Hacker, 459 F.3d at 937; 20 C.F.R. § 404.1527(d)(2). It is the ALJ's duty to resolve conflicts in the evidence. See Hacker, 459 F.3d at 936.

The undersigned concludes the ALJ gave good reasons for assigning less than controlling weight to Dr. Bradford's opinion. The ALJ found Dr. Bradford's opinion was inconsistent with other record evidence. (Tr. 63.) For example, when plaintiff was receiving treatment every three weeks, his condition did not deteriorate to the extent opined by Dr. Bradford. While Dr. Bradford opined that plaintiff would be unable to walk even one block in the period just before debridement, the record evidence shows that a few days prior to debridement, plaintiff had a normal gait and stance and did not complain of any foot pain. (Tr. 63, 301, 328, 332-33, 358-59, 375-76.) Also, despite the severe foot limitations opined by Dr. Bradford, consultative examiner Dr. Morris opined that plaintiff could stand and walk for 30 minutes at one time; stand for 2 hours and walk for 1 hour total in an 8-hour workday; occasionally climb, stoop, and kneel; and continuously operate foot controls. (Tr. 437-39.) In fact, during the time plaintiff was not receiving treatment, he continued to demonstrate a normal gait and stance. (Tr. 63, 249, 413.)

The undersigned disagrees with plaintiff's argument that because the ALJ described Dr. Bradford's statement as "somewhat ambiguous," he was required to recontact Dr. Bradford for clarification. Cf. Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006) (where the ALJ discounts

-14-

a physician's opinion because it is inconsistent with other substantial evidence of record, the ALJ need not recontact the physician); Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)(same). Any ambiguity indicated by the ALJ was avoided by the ALJ's analysis of Dr. Bradford's reports in the context of the medical evidence generally.

The undersigned disagrees with the ALJ's interpretation of Dr. Bradford's report of September 17, 2008, quoted above, in one respect. The ALJ stated that "Dr. Bradford pointed out that the *pain* can be managed well with an inexpensive orthotic device, which the claimant was reluctant to obtain." (Tr. 63.)(emphasis added). However, the record demonstrates that Dr. Bradford said that "[t]he *flatfoot deformity* can usually be improved with foot orthotics, and these have been recommended to the patient cost = $15.00." (Tr. 359.)(emphasis added). Dr. Bradford did not state that plaintiff's pain was due to his flatfoot deformity or that he was "reluctant to obtain" orthotics, but that plaintiff was reluctant to undergo surgery. (Tr. 324 327, 330-33, 336-37, 343, 358-59.) Nevertheless, the record is clear that Dr. Bradford considered the pain experienced by plaintiff due to the conditions of this feet, other than the lack of arches, was substantially relieved by periodic debridement procedures.

The ALJ also stated that Dr. Bradford's treatment notes "do not indicate that these kinds of limitations [(plaintiff's corns and calluses)] are chronic and largely continuous ones." (Tr. 63.) However, the need for repeated debridement through paring and curettage of hyperkeratotic lesions over an extended period of time demonstrates that the underlying condition is indeed chronic. In addition, Dr. Bradford did not state that the limitations were continuous, but that they frequently and regularly recur. Finally, the ALJ stated that "[m]ost of the time [Dr. Bradford] saw the claimant for routine palliative foot care," i.e., for repeated debridement. (Tr. 63.) The undersigned believes the fact that the debridement is "routine" supports the chronic nature of plaintiff's condition. Nevertheless, Dr. Bradford's reports indicate that plaintiff receives substantial relief from the pain due to the corns and calluses after the debridement procedures.

The undersigned concludes that the ALJ properly assigned some weight to Dr. Bradford's opinion by limiting plaintiff to sedentary work involving little walking or standing. (Tr. 62-63.)

Therefore, for all of the above reasons, the undersigned concludes the ALJ properly found Dr. Bradford's opinion was inconsistent with other record evidence and the ALJ's decision is therefore supported by substantial evidence in the record as a whole.

**2.    Psychological Consultative Examination**

Plaintiff argues the ALJ erred in failing to refer him for a psychological consultative exam in violation of the ALJ's duty to develop the record. In support, plaintiff cites Dr. Khalifa's report, which states that he complained of stress, as well as forms submitted with his application, which state that he was "stressed out" and listed stress as a condition preventing him from being able to work.

The ALJ does not have to develop the record on plaintiff's mental health allegations, unless "such evaluation is necessary for [the ALJ] to make an informed decision." Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001) (citations omitted). Here the ALJ found that no physician or other treatment provider had stated or implied that plaintiff's symptoms were the product of a mental impairment. (Tr. 64.) Moreover, the undersigned concludes the record evidence provides a sufficient basis for the ALJ's decision. (Tr. 38.)

The record evidence establishes that plaintiff reported mental symptoms on only a few occasions. Plaintiff presented to his treating and examining sources on most occasions in no acute distress, with no complaints of mental symptoms. The fact that plaintiff infrequently complained of mental symptoms supports the ALJ's decision that he did not have any mental impairments. Finally, even when plaintiff reported mental symptoms, his treating and examining sources did not refer him to mental health treatment. Accordingly, the undersigned finds substantial evidence in the record to support the ALJ's finding in this regard.

### 3. Residual Functional Capacity

RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ found plaintiff retained the RFC to perform sedentary work requiring no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 62, 66.) The ALJ then found that plaintiff could not return to his past relevant work. (Id.) At Step Five, the ALJ posed a hypothetical question to the VE based on plaintiff's age, education, and an RFC for work performed at the sedentary exertional level with all the nonexertional limitations included in plaintiff's RFC. (Tr. 46-47.) The VE testified that the hypothetical individual could perform work as a food and beverage clerk, medical supply packer, or weight tester. (Id.)

Plaintiff argues that the hypothetical was not proper because it did not include all the limitations set forth by Dr. Bradford. However, as discussed above, the degree of limitation opined by Dr. Bradford was not credible. The VE's testimony that plaintiff retained the RFC to perform other light and sedentary work constitutes substantial evidence supporting the Commissioner's decision. See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

The undersigned therefore concludes substantial evidence supports the ALJ's decision not to incorporate all the limitations opined by Dr. Bradford in the RFC or hypothetical. (Tr. 46-47, 66.)

### VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the final decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have until September 24, 2010 to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.

       /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 17, 2010.